Good morning, your honors. Good morning, Attorney Smith. My name is Alan Jeffrey Weiss. I'm appointed counsel for Nilda Morton. I'd like to reserve about four minutes for rebuttal if I may. Yes, that's granted. And I should have said this at the outset for the benefit of all of you. This court's traditions are such that we are never completely wedded to the clock and even less so these days. So we will not be putting the hook out if you're over time. In fact, we'll certainly be more than indulgent in that respect. So I care. Proceed. This is an appeal from a conviction for criminal contempt. The issues here are a misapprehension, we believe, by the government and by the district court that this is a contract case, but it's a criminal proceeding. The government believes this matter is governed by contract principles because there was a cooperation agreement. Well, let's let's stop right there or return to that in a bit. But I and I must say I have numerous concerns about this and how the proceeding in the supervised release revocation matter and then beyond. But as I understand it, you've raised an issue here regarding the validity or more to the point the invalidity according to Ms. Morton of the court's directives to her. But you didn't raise this issue during the contempt proceeding itself. Isn't that right? No, I did, Your Honor. We consistently challenged the proceedings at the at the trial portion of this, the contempt trial. How in what way did you actually raise the invalidity issue? We asked the judge to find that there was a good faith basis for her position that the she was acting on advice of counsel. We also indicated. Is that an but we explained to the court the situation in which this arose and the court, the district court found that the directives at the contempt, excuse me, at the Fagan revocation hearing to Ms. Morton required her to answer, even though there was no immunity agreement. I'm in this unusual situation because I wasn't counsel at the Fagan revocation hearing the council. Well, that's I mean, that's that's not necessarily unusual at our stage where we hear from counsel who were not representing a party at a particular stage of a proceeding. But it does seem from my understanding of the record that you're correct and that there there was no immunization, no grant of immunity in this Morton. Uh, am I correct that there is nowhere in the record in the section 6002 order? That's correct, your honor. And and also let me ask you and I'll be interested in part of the record anyway. Um, the plea agreement was mentioned at the Fagan revocation hearing. It was never put into evidence and it was never put into evidence at the trial. All right. Oh, but so and the government, of course, can speak to its position. But my understanding is that the government is relying essentially on on her guilty plea. That is to say that her plea of guilty effectively went to those matters which she would have claimed to have been privileged and therefore the plea itself extinguished her privilege against self incrimination. Is that your understanding of the government's position? Yes, your honor. Why aren't they correct about that? Because there are other crimes that were not included within the original guilty plea, the original indictment which she could be subject to. She could be charged with money laundering, she could be charged with tax evasion, she could be charged with a RICO conspiracy to name a few. I haven't gone through the federal code to get all the particular crimes and I'm not a prosecutor by trade. But there's certainly a plethora of crimes which she could have been charged with had she testified with regard to the issues that were being brought up at the Fagan revocation hearing. She was immunized, which doesn't even immunize, she was pled guilty to drug conspiracy and the matters in the evidence at the Fagan revocation hearing, her indictment, nor was it presented as evidence at the trial. We have an unusual situation here. This is, it goes back to what happened at the revocation hearing. The attorney who was brought in to advise her at that sort of 11th hour, Mr. Miller, clearly wasn't up to speed on all the nuances and principles with regard to the Fifth Amendment, with regard to contempt issues, with regard to immunity. This is important because, as I said forth in my briefs, the Supreme Court has pointed out that, you know, advice of counsel is a critical, critical stage here. She asked the court not, she didn't come into court and say, I'm taking the Fifth Amendment. She said to the court, can I take the Fifth Amendment? The judge then allowed her to have appointed counsel, her original counsel, Mr. Matos was not available. And so he pulled in an attorney who was leaving magistrates chambers to provide her advice and allowed them to consult. When the district court questioned Mr. Miller about whether he had an adequate opportunity to consult and whether he understood all the ramifications with regard to the prior plea agreement, he said he didn't have any idea what they were talking about. I'm paraphrasing these words, not exactly. And but the court went ahead anyway, and allowed Mr. Miller to be her appointed counsel. The fact that you have an attorney who's standing there, who may be licensed and who may have practiced to some degree with criminal law doesn't mean that they're particularly knowledgeable about the area that they're being asked to give advice on. It puts I'm not sure where you're going with this. Or it sounds like it sounds like an ineffective assistance of counsel. It is your honor, and I'm bringing it up reluctantly, because I don't like accusing brother counsel of being ineffective. But here, I think the records here. Well, even if you are, our fairly consistent jurisprudence would suggest would it not that a direct appeal of this kind is not the juncture at which it is best to be raising an issue of ineffectiveness of counsel. I'm curious about the the position that I understand the government to be taking. And that is, if they're indeed relying upon her plea is effectively extinguishing any claim to privilege she might have had, what kind of analysis did the district court go through? That would have made it clear, both on the record and for our purposes, that there was a coincidence, if you will, or at overlap of matters that would remain open for prosecution. And those about which she was not pleading guilty to were even factual aspects or legal issues she was not pleading guilty to. What analysis was done by the district court at the time? I think as I pointed out in my brief, we didn't see anything in the record. And I don't recall anything that the district court did to make an analysis of whether or not there was a reasonable belief that her answers would tend to incriminate her and that the assertion of the Fifth Amendment was appropriate. I have to digress for just one moment. And I'm answering your question. But this is something that's your honor. In preparing for your argument, I realized that the 10th Circuit last month has handed down an opinion that has some bearing on this case. I haven't had an opportunity to present it to the court. But I'd like to just mention that it's United States versus Oldman. It's a case that was handed down on Pazer, a site of 979 Fed Third 1234. It's appellate case number 19-8023 from the 10th Circuit. In that case, we have a defense witness to take the Fifth Amendment when the defense witness had already pled guilty to a series of crimes and supposedly was going to testify to matters that would be helpful to the defense. In that case, just like in this case, we didn't have an immunity. What we had was a defense witness to testify to matters that would be helpful to the defense. And so the 10th Circuit there said the issue was authentic danger. I think that's what you're talking about in asking whether the court, the district court in our case, made any determination whether there was any authentic danger that Ms. Morton could reasonably believe she was in and she testified. And what the court, the 10th Circuit said, quoting Hoffman versus the United States, that an individual does not lose his right to self-incrimination unless it's perfectly clear from a careful consideration of all the circumstances in the case that the witness is mistaken and his answers could not possibly have a tendency to find the witness could invoke the Fifth Amendment and therefore could not testify in defense and there was no reversible error for the defendant. In our case, we have an analogous situation, but there was no fact finding by the district court. Counsel, can I ask you a question? Let's jump to the validity then, because I think this is where you're going. The validity of Judge Gomez's findings. Maybe you can tell me, the first time she invoked her Fifth Amendment right, the question was, do you recognize this exhibit Ms. Morton? How does that pose a risk of self-incrimination? It doesn't, Your Honor. There are, again, and if you go through the record very carefully, she has advice of counsel who's telling her, in effect, essentially you're doing fine, stick to your guts. And this is the problem with the proceeding, and I view it as one of fundamental fairness. You have the court appointing an attorney who is not the attorney on a primary case, and there's a very short period of time for them to confer. And then we have these proceedings going on where the attorney is telling her one thing and the judge is telling her something else. I think the court needed to go further in its instructions to her and in its determination to make a determination as to why these were not valid objections. And Ms. Morton later answered many questions, later testified to certain things. And the court, in fact, made a finding at the Fagan revocation hearing that her testimony that she did give was helpful. Well, and you referred earlier to the cooperation agreement, and I assume your position is that the cooperation agreement by itself would not be sufficient. That's correct. I've never seen a situation unfold quite like this one did. In my experience, when a witness takes five, it gives way to a grant of immunity, which requires an order in most instances. There are differences in state practice and federal practice, of course, or it requires a court to make determinations that the invocation is addressed to matters that the witness has already pled guilty to, and there would need to be determinations made, specific determinations made in that regard. And I don't see that the record covered that, but I'd be interested to hear what Ms. Smith has to say in that regard. Judge Mady, do you want to get in here? Nothing at this time, Chief. Thank you. All right. Do you have anything further that you would like to inquire into, Mr. Weiss, or that you would like to argue to us? I just would like to reiterate some of the points that were made in brief very quickly here. I think there's also an issue here with classification of the offense, which the court should speak to. I think there's a split within the jurisdictions as to how this offense should be handled from a sentencing standpoint. Can I ask you a question, counsel? I'm sorry to interrupt you, but it seems that you had some real heartburn over the classification of this as a Class 8 felony. Does it matter? Does it matter what you call it? I mean, I understand that obviously the sentence is something that you have a problem with, but does it matter what we call it exactly? I think it does, and I think it does from a going forward standpoint, Your Honor. For purposes of the sentencing guidelines? For purposes of the sentencing guidelines, I don't believe it does because the sentencing guidelines require the most analogous offense here. And that's what I'd ask Your Honor to look at. And that's where I'm talking about there's a split in the jurisdictions. There's law that suggests that what the court did here was appropriate obstruction. There's law that suggests that the most appropriate and most analogous offense is the failure of a material witness to appear. It puts, I think, the courts, the lower courts and counsel in an unusual situation where we have trouble giving advice to clients. And I think that clarification on that would be helpful. But doesn't it depend on the circumstances of an individual case? I don't think that there can be a bright line rule here unless you think otherwise. Well, I think in the circumstances of this case and in the circumstances where you're dealing with contempt for someone who's not testifying, refusing to testify, there you have to, I think, make the determination whether it meets the obstruction standard or whether it's the failure of a witness to appear. By not testifying, the witness is essentially not appearing. Thank you, Your Honor. All right. Thank you. And we will have you back on rebuttal. Ms. Smith. Good morning, Your Honor. DLU Smith appearing on behalf of the United States. Good morning, Ms. Smith. Let me right out of the box ask this. The government's brief at page 16 expressly characterizes Ms. Morton as an immunized witness. Yes, Your Honor. How? When? Because I can't find it in the record. Your Honor, I will concede that the court here could have gone further in perfecting a record. There's no question about that. And let me be very clear that that's one of the things that's surprising because Judge Gomez was a good judge and a very thorough judge. And so I'm a bit surprised that there was not the analysis. But you have chosen to use the word immunized. Yes, Your Honor. And I'm curious. You, I'm sure, concede that there was no 6002 order entered here. And, Your Honor, the government submits that the assertion of privilege... You do agree with that. Am I correct? I agree, Your Honor, that there is no assertion in the records to immunity. And that's only because immunity was a privilege that was not afforded under these, the totality of these circumstances. What I can ask the court to consider is that Judge Gomez, throughout the, all of the pleadings involving Ms. Morton, was the presiding judge. Judge Gomez presided over the indictment, the plea agreement... And he did not issue a 6002 order, correct? That is correct, Your Honor. All right. So that means we have to look to some other path. Yes, Your Honor. Did the government enter into an immunity agreement with Ms. Morton of any kind? We did not. We entered into a cooperation and plea agreement for which the language, we believe, expressly provides the contours of the agreement, which includes testimony, if required by the United States, that the defendant or Ms. Morton participates in any interviews and provide testimony in any subsequent proceedings. And, Your Honor, the benefit of that agreement was, in fact, realized by Ms. Morton at sentencing with a huge... ...to withdraw from the plea agreement that was entered into in this case, right? That is correct. The court, however, can take judicial notice that this would have been the third such proceeding that Ms. Morton would have testified in pursuant to her cooperation agreement. So what? I'm sorry? What import does a cooperation agreement, which speaks in much more general terms, have to do with the issue of immunization? Well, Your Honor, we submit that there was no such exposure to any other crimes outside of the agreement. And you might be correct. Yes, Your Honor. But if you're correct in that, isn't it up to you to argue to the district court exactly why the matters to which Ms. Morton pled are directly or are precisely the matters about which she is now subject to inquiry... ...thereby affords a basis for a designation of immunity? You didn't do that and the court didn't inquire, did it? Well, Your Honor, the court did, in fact, inquire. When the court asked the government whether or not the transaction that was explained at the revocation hearing, the court inquired as to what the offense was that Mr. Fagan would have been charged with at revocation. And the government proceeded to explain that the criminal conduct that Mr. Fagan was being charged with was attempting to facilitate a drug debt collection on behalf of Ms. Morton. And the court did inquire whether or not it occurred on or about the same criminal period or activity for which Ms. Morton... That is found on page 5 of my brief, Your Honor. And the court inquired, and when did it occur? And the response from the government was it occurred on or about June 30, 2016 and July 1, 2016. And the court inquired, would that be for the same date for persons associated with the criminal activity? And the government's response was yes, the same date, the same conduct. And I guess, yes, the government is asking that the court make a leap, but it's not a very big one because the district judge, Judge Gomez... It's a big one, I suppose, for someone who's doing 37 months because of a finding or an adjudication of criminal contempt. Your Honor, Ms. Morton received the benefit of a cooperation agreement. She received a substantially reduced sentence in exchange for her cooperation. Not on the criminal contempt adjudication. Well, on the criminal contempt adjudication, Your Honor, was one in which Ms. Morton was asked to provide testimony that was within the course of conduct for which she had already pleaded guilty and was sentenced to. So there was no exposure for any additional criminal penalties based on the time for which the incidents occurred. She had already pled guilty to those two transactions back in June of 2016 and July of 2016. Let me give you a specific example, and that is an example of a charge to which she did not plead guilty. Ms. Morton was originally charged by your office with, among other things, conspiracy. Yes, Your Honor. But she did not plead guilty to that charge, correct? Yes. We dismissed with prejudice, Your Honor. Upon her plea, the charge of conspiracy in addition to money laundering, which counsel previously stated, were dismissed in exchange for the seven counts for which Ms. Morton did in fact plead guilty to. So might not her answers to the inquiries relative to the telephone call that was captured in the Title III conceivably open her to liability, criminal liability, for activity that was involved in a conspiracy? No, Your Honor, because the plea agreement specifically states that the government will not charge any further charges, bring any further charges arising from the same facts and circumstances that were involved in this conspiracy. So that language... Was this conversation involved in that same conspiracy with which she was charged and for which the conspiracy charge was dropped? Yes, it was, Your Honor. As we indicated in our brief, there was only one set of facts here. And the June 2016 transaction for which Ms. Morton pled guilty was incorporated in the overarching conspiracy charged in Count 1. That count was dismissed, and it was to protect Ms. Morton from any further exposure where relevant conduct would have been an issue at sentencing. So that was part of the negotiation, and we did in fact, and it was encompassed in that Count 1 conspiracy. Okay, let's assume, let's just assume for argument purposes that you're correct about the conspiracy charge. What was the basis of Mr. Fagan's supervised release revocation proceeding? That is, what was the underlying offense that gave rise to that petition? The underlying offense, Your Honor, was not to commit any state, local, or federal violations while under supervised release. Mr. Fagan had just been released from prison having served a 14-year sentence in another criminal matter before Judge Gomez in Criminal No. 2006-80 and 2005-76. Upon release, however, Mr. Fagan agreed to assist Ms. Morton in the facilitation or collection of a drug exceeding $100,000 because Ms. Morton knew that Mr. Alexi Emanuel, the individual who she had sold 5 kilograms of cocaine to, that they were friends. They had been charged previously in the same... Was Mr. Fagan charged with a Section 843 offense for illicit use of the phone? No, Your Honor. We proceeded with the violation, supervised release violation, as opposed to... At the time, Your Honor, that we had reviewed the Title III calls, we had already... The indictment had already been filed, so the government decided that it would be best for us to pursue a supervised release violation as opposed to superseding the indictment to just add one count of phone facilitation. Isn't it reasonable, and wouldn't it have been reasonable, for Ms. Morton to be concerned that she could be opening herself up, herself, to a possible violation of Section 843 by virtue of that telephone call, the use of the phone? No, Your Honor. We submitted it would not. Your Honor, to suggest that... I understand. Why not? Right. Well, the facts are that if a defendant has been sentenced and receives a 96-month sentence, that it would be reasonable for the government to subsequently charge them with an 843, which only has an exposure of a year to penalty, is somewhat unreasonable and impractical, as well as the language... I doubt that what's practical for the prosecution was a consideration that was going through Ms. Morton's mind at the time. Your Honor, I believe, Your Honor, that the language of the plea agreement and the fact that Ms. Morton had already testified against other co-conspirators and had not received any punishment or was facing any future criminal charges, we submit that it would not have been practical to come with a year exposure with a phone facilitation and, in fact, Ms. Morton is the person who provided us with this information by authenticating and identifying Mr. Fagan as the caller who attempted to... Ms. Smith, putting aside the practicalities and efficiencies that your office might account for, aren't the explicit terms of the agreement into which Ms. Morton entered that it applies only to your office, to the office of the United States Attorney for the Virgin Islands, and that she could conceivably be opening herself up to prosecution by the U.S. Attorney for the Eastern District of New York or the Attorney General of the State of New York? Your Honor, the agreement, the court is correct. The agreement stretches... the limits of the agreement between Ms. Morton and the United States is to the District of the Virgin Islands. The court is correct. Your Honor, however, I don't think that there's a situation where a District of New York would proceed with a phone facilitation for conduct that occurred here in the United States Virgin Islands. That call was made in our district. The District of New York would not have jurisdiction to charge for a phone facilitation count that occurred within the borders of this district. Again, we submit that Ms. Morton clearly and expressly understood, implicitly understood, that as she was aided by counsel, Mr. Juan de Matos, when we negotiated her plea and cooperation agreement, Ms. Morton... I apologize, Your Honor. We have a censor that goes out, and I apologize. That's all right. Ms. Morton understood that the requirements under the agreement would be to testify for all of the criminal conduct that involved the series of events that occurred from her conspiracy, which stemmed from 2015 through 2016. There was nothing within this request that was in violation of Ms. Morton's right, Fifth Amendment right. We believe that it was an improper invocation, as the court so directed and instructed Ms. Morton on numerous occasions. And we believe, Your Honor, that Ms. Morton, having been privy to so many criminal appearances before this judge, fully understood the limitations within which she could appropriately invoke her Fifth Amendment right, and this was not one of them. Judge Shigaris and Judge Matey. I have a couple of questions, Chief. One is, I noticed that your office counsel charged just one count of contempt. Does that mean that any instance of disobeying the district court's commands would justify the conviction? Your Honor, that was a quagmire when we were, in fact, about to charge, because there were many instances in which the court directed Ms. Morton after advising her of the improper invocation of the Fifth Amendment, and she proceeded yet to disobey the court's order to respond. Your Honor, we felt, however, that one charge was sufficient in this case. It was not to punish Ms. Morton. So one instance of disobeying the district court's command could justify this conviction? Is that what you're saying? Your Honor, arguably... You counted like nine. Yes, Your Honor, there were nine. And yes, the United States did consider all instances for which the court was disobeyed. Your Honor... Well, here's what I'm getting at. If we look down this list of nine and say, you know, five of them are no good, but, you know, that we don't agree with what the district court did, but two of them we do, does this conviction stand? Your Honor, we believe that all nine instances for which the court... We disagree with you, counsel. Let's say we only agree with you on two of them. Is that enough to have this conviction stand? No, Your Honor, because any instance in which a defendant is ordered by a court after being advised of the improperness of such invocation, any one instance, Your Honor, is enough to be punished by the court. And we believe that... I'm sorry, go ahead. We believe that one count encompasses all nine instances and that all nine instances... The sentence for which Ms. Morton received is sufficient to address those nine instances, whether it were one or nine. All right, well, that's my next question. If we disagree with you that some of them the district court was wrong, let's say just for purposes of hypothetically speaking, we think that of the nine, seven of them were in error, but two weren't in error. Wouldn't this case have to go back for sentencing? No, Your Honor. I disagree in that the statute addresses the willful behavior of a witness not to comport or to respond when ordered to do so. And so we submit that the sentence, if any one instance of disobeying, a willful disobeying the court's order is sufficient to address the sentence that has been rendered by the court. Okay. And just another question, moving on to the sentence. Your adversary had an issue with the specific offense characteristics enhancement. And my question to you, because I don't think it's addressed in your brief, is why was Morton's travel to the hearing an unnecessary expenditure for sentencing purposes? Didn't the district court, as your adversary just pointed out and pointed out in his brief, credit her testimony and say that it was helpful, notwithstanding the invocations of the Fifth Amendment? Your Honor, I will beg the court to repeat your question. I'm not sure I'm following you, and I would like to be able to address your concern. Okay, no problem. Your friend said, and part of the specific offense characteristics enhancement is, did the government incur an unnecessary expenditure for sentencing purposes? And it's an enhancement. Okay. Was this an unnecessary expenditure, bringing her to this hearing? Maybe I'm throwing you for a curveball here. Your Honor. That's fine. Okay. All right. Judge Meadey. Your Honor, as far... Go ahead, Ms. Smith. Yes, to address the last question as to whether Ms. Morton's appearance at the revocation hearing was an unnecessary expenditure. Right. Is that the court's question? That's right. Your Honor, I submit that it was a necessary expenditure. All right. Let me follow up on that, not so much as it may be relevant to sentencing consideration, but just as background here against the overriding fact that there was a contempt adjudication, which resulted in a 37-month sentence. And it does have to do with the necessity, if you will, the legal necessity of Ms. Morton's testimony at this revocation hearing. Yes. The government, of course, had the burden of going forward and the burden of proof with respect to any violation. But we all know that evidentiary rules in proceedings of this kind and similar proceedings are relaxed. We don't necessarily have a formal application of all the FREs. And beyond that, there was other substantive evidence. And I'm curious, I think, as a matter of fact, at one point that you had indicated in your brief on page six that Ms. Morton was your sole witness, but she wasn't. You had Agent Gerard, who was there as well, I believe, prepared to testify in any event. And you had tape. You had Title III calls that had been recorded. So I'm wondering why it was even necessary to have called Ms. Morton as a witness. Couldn't you have shown a sufficient basis, not only with relaxed rules of evidence, but also a lower standard of proof that in fact the violation of Mr. Fagan's supervised release had occurred here without her testimony? Your Honor, in hindsight, and because the government was forced to produce a second witness, which was not on our witness list, who we called as an impromptu witness, who had just been sitting in the courtroom and viewing the proceedings, we did have to rely on Agent Gerard because he was a co-case agent involving Ms. Morton and was very familiar with both Mr. Fagan and Ms. Morton. However, prior to that hearing, the government intended to proceed with Ms. Morton because we always want to present the best evidence, especially with a judge such as Gomez, notwithstanding the relaxing of the federal rules of evidence where we can rely on hearsay. Understood. But would you agree with me that given the relaxed evidentiary regime I've described, that the government could have met its burden of proof of showing a violation even without Ms. Morton taking the stand? I agree, Your Honor, but that is not the practice in our district. Our district judge required us to present the best evidence, which is the witness themselves. And so, yes, Your Honor, that can be done and is very practical perhaps in other districts. In our district, however, our judge at the time, the sitting Judge Gomez, required the government to produce its best evidence. And so, yes, Your Honor. I understand. Any further questions, Judge Shigaris or Judge Macy? None for me. Nothing further. All right. Thank you, gentlemen. Mr. Weiss, you have rebuttal? Very briefly. Going back to the issue of whether or not Ms. Morton had a reasonable belief that her answers could tend to incriminate or lead to a link that would tend to incriminate her. There's something that I've noted in my brief. It's at footnote two of that brief, and it sets forth the trial testimony there. Even Ms. Morton's original counsel, Juan De Matos, who was just mentioned by Attorney Smith, indicated to the court that he did not believe the plea agreement covered every potential crime she had committed or every potential liability. So we have her attorney telling her that and telling the court that. There's no record at all, as Your Honor has just pointed out at the trial or at the Fagan hearing, that Judge Gomez made any determination of that. Isn't that the important point, Mr. Weiss? Not that an attorney said this to her, not that she believed what her attorney said to her, but rather that this record is devoid of any analysis by the district court that the plea indeed included or subsumed all of these potential areas of criminal liability. The issue is I think the court had to make that finding, and there's nothing in the record to do that. I don't believe that there was a finding as to that. With regard to the questions posed to Attorney Smith regarding one instance of contempt, I think for the court to find that, then, as I think Your Honor has pointed out, we have a sentencing issue, and we have to go back for resentencing because there's a difference between, I think, one act of contempt and the severity and whether there's seven or nine. I got, when I counted this, that there were seven instances of contempt. There are two instances that are duplicative. The prosecution seems to think, in their brief, there were 33 or 28 or 27 or 21 or nine, depending on which version and which point of the proceedings we're talking about. But I think, as Your Honor pointed out, one count, one act of disobeying a court order, a court order is an order. It's not a suggestion, and I understand that. I think we all do, but I think it impacts on sentencing. Thank you. I've got nothing further. I think my brief covers everything else. There was a number of other issues that were covered in the brief. I don't think it's necessary. None of which would need to be reached if, in fact, the adjudication of contempt was erroneous, correct? Yes, Your Honor, that's correct. All right. Thank you very much, Mr. Weiss and Ms. Smith. We will take the matter under advisement.